Trenton R. Kashima (SBN No. 291405)
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC**
402 West Broadway St., Suite 1760
San Diego, CA 92101
Tel: (619) 810-7047
tkashima@milberg.com

*Attorneys for Plaintiffs and the Class*

[Additional Counsel Listed on Signature Page]

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHELSEA GARLAND, TONYA HUGHES, NATASHA HERNANDEZ, GEANEEN COJOM, ARSENIO PELAYO, ALBERT FITCH, PAULEEN MARA, LORA PREMO, URCELINA MEDEIROS, RUBY SMITH, individually and on behalf of all those similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>DUNKIN DONUTS FRANCHISING, LLC, 6201 HOLLYWOOD DONUTS LLC, BURTON RESTAURANTS, LLC, RW OAKLAND LLC, MADISON FOOD MANAGEMENT, LLC, GOLDEN GATE RESTAURANT GROUP, LLC,<br><br>        Defendants. | Case No.: 3:23-cv-06621-SI<br><br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiffs, CHELSEA GARLAND, GEANEEN COJOM, TONYA HUGHES, NATASHA HERNANDEZ, ARSENIO PELAYO, ALBERT FITCH, PAULEEN MARA, LORA PREMO, URCELINA MEDEIROS and RUBY SMITH (referred to individually as "Plaintiff" or collectively as "Plaintiffs") bring this First Amended Class Action Complaint against the above-named DUNKIN DONUTS FRANCHISING LLC, a Delaware Limited Liability Company, ("Dunkin"), 6201 HOLLYWOOD DONUTS LLC, BURTON RESTAURANTS, LLC, RW OAKLAND LLC, MADISON FOOD MANAGEMENT, LLC, and GOLDEN GATE RESTAURANT GROUP LLC (together "Franchisees")(collectively, Dunkin and its Franchisees may be referred to as "Defendants"), and in support thereof states the following:

## INTRODUCTION

1.     Plaintiffs bring this action against Defendants on behalf of all consumers in California, New York, Texas, Colorado, Massachusetts and Hawaii and in the United States who, within four years of the filing of this lawsuit, have purchased coffee-based drinks, tea-based drinks, or other beverages from Defendants that contained non-dairy milk alternatives ("Non-Dairy Alternatives") and paid a surcharge for the Non-Dairy Alternatives, including plant-based or lactose-free milk.

2.     Plaintiffs suffer from lactose intolerance and milk allergies. It is medically necessary for persons like Plaintiffs to avoid consuming drinks that contain milk. Plaintiffs ordered coffee-based, tea-based, and other drinks at Dunkin retail coffee shops in their respective states of residence from at least 2018 to the present.

3.     Dunkin and its Franchisees operate retail stores in the United States that sell crafted coffee beverages, drinks and other food items to consumers commonly known as "Dunkin Donuts" stores.

4.     When Plaintiffs visited Dunkin Donuts coffee shops, they ordered drinks that included milk as part of the regular menu item. Plaintiffs requested to substitute milk for Non-Dairy Alternatives, specifically soy, oat, coconut, or almond "milk," and were charged an extra $0.50 - $2.15 surcharge by Dunkin and its Franchisees for the substitution, depending on the date and the location of the store.

5.     Dunkin and its Franchisees charged a $0.50 to $2.15 surcharge ("Surcharge") at their

Dunkin Donuts stores to their customers who were lactose intolerant to substitute milk for Non-Dairy Alternative products in its beverages throughout the class period.

6. Defendants' Surcharge is the same for all Non-Dairy Alternatives, making no distinction among the costs of the different Non-Dairy Alternatives. In fact, Dunkin and its Franchisees created a separate, higher-priced menu, aimed at customers who cannot ingest milk.

7. In 2023, the average price of a Dunkin Donuts crafted coffee drink was $4.50, therefore the Surcharge could be up to 40% of the average drink price. Also, milk is not the only ingredient in a drink at Dunkin Donuts stores, therefore the Surcharge represents an even higher percentage proportional to the price of milk (up to 200%).

8. There is no material difference between the price of lactose-containing milks and the price of Non-Dairy Alternatives that would support levying the Surcharge to substitute for a Non-Dairy Alternative in Dunkin Donuts drinks.

9. Recognizing the price similarity, other national coffee chains, like Tim Hortons and Blue Bottle, do not levy a Surcharge for replacing cow's milk with Non-Dairy Alternatives.

10. Additionally, on November 7, 2024, the world's biggest coffee chain, Starbucks, eliminated its Surcharge on Non-Dairy Alternatives at all of its United States' retail stores as part of the implementation of its 2024 holiday menu. Previously, for many years, Starbucks had eliminated the Non-Dairy Alternatives Surcharge at many of its international locations, including all the 1,215 locations in the U.K., 937 stores in the European Union and 1,893 stores in Korea. The 1,415 Starbucks stores in Japan offer a soy option without imposing a surcharge. Starbucks offers oat milk at the 6,000 locations China without imposing an additional surcharge.

11. Dunkin Donuts stores' standard offering in most beverages is 2% cow's milk.

12. Dunkin Donuts stores will substitute whole milk or fat-free skim milk for the 2% milk ingredient in its beverages at no additional charge.

13. Dunkin Donuts stores offer several options when it comes to the content of fat in the milk but do not offer a lactose-free milk option.

14. Dunkin Donuts stores will modify their regular beverage offerings to remove caffeine

or make caffeine-free beverages at no additional charge for persons with a variety of conditions, including hypertension.

15. Dunkin Donuts stores will modify their regular beverage offerings to remove sugar or use sugar-free sweeteners at no additional charge for those persons with diabetes or who need to control weight.

16. Dunkin Donuts stores advise customers to inform the "server" if there is a food allergy and inform them that their products may contain or may have come in contact with allergens. However, they only accommodate those with lactose intolerance or allergies to milk by imposing a Surcharge.

 

"Allergen statement" displayed in a Dunkin store

17. There is no expertise or additional work required of Dunkin Donuts store employees to substitute Non-Dairy Alternatives such as soy, almond, coconut, oat, or other lactose-free "milk" in place of 2% regular milk.

18. Lactose intolerance is a disability.

19. A milk allergy is a disability.

20. Dunkin and its Franchisees charge customers with lactose intolerance and milk allergies an excessively high Surcharge to substitute Non-Dairy Alternatives in its drinks.

21. In this way, Defendants' conduct violates the Americans with Disabilities Act, California Unruh Civil Rights Act, Colorado Anti-Discrimination Act, Hawaii Anti-Discrimination Act, Texas Human Resource Code, Massachusetts Anti-Discrimination Law, New York Civil Rights Law and constitutes common law Unjust Enrichment.

FIRST AMENDED CLASS ACTION COMPLAINT

22.     Defendants discriminate against Plaintiffs and the putative class members by levying a Surcharge for their Non-Dairy Alternatives in the form of Non-Dairy Alternatives added to their crafted coffee-based drinks and other beverages.

23.     Plaintiffs also seek declaratory and injunctive relief to ensure that Defendants charge the same price to lactose intolerant customers and customers with milk allergies for the same menu items as regular customers and that it does not add a Surcharge for Non-Dairy Alternatives such as soy, almond, coconut, oat, or other lactose-free "milk."

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over the subject matter of this civil action pursuant to 28 U.S.C. § 1332(d). This is a putative class action where: (i) each of the proposed classes consists of more than 100 members; (ii) at least one class member has a different citizenship from at least one Defendant; and (iii) the claims of the proposed classes exceed $5,000,000 in the aggregate. The Court has supplemental jurisdiction over the state law claims alleged herein pursuant to 28 U.S.C. § 1367(a).

25.     The Court has personal jurisdiction over the Defendants due to their continuous and systemic contacts with the State of California.

26.     Defendant Dunkin Donuts Franchising LLC entered into franchising agreements for the purpose of operating retail stores in the San Francisco Bay area, Walnut Creek, Half Moon Bay, South San Francisco and Fremont, all within the State of California and the Northern District of California.

27.     Dunkin exercises a high degree of control over the operations of its franchisees, including the pricing of goods, the equipment to be used in stores, point-of-sale (POS) software, and suppliers for Non-Dairy Alternatives.

28.     Dunkin directs the goods sold by its Franchisees, including Non-Dairy Alternatives. Dunkin directs the pricing structure for goods to be used by its Franchisees, including suggesting a minimum price to be charged for Non-Dairy Alternatives.  For example, in 2022, Dunkin recommended a surcharge for almond milk and oat milk in its crafted coffee beverages in an amount of $.50.

29.     Dunkin requires its franchisees to use a particular type of POS system, including a

- 5 -

specific vendor, including the set costs for that software vendor. The POS software is used universally by Dunkin's franchisees for implementing the franchisee's pricing and charges, including for Non-Dairy Alternatives. Dunkin requires its franchisees to use a specific software system to maintain inventory, including for Non-Dairy Alternatives. Dunkin has to approve the suppliers, the computer hardware and ordering systems used by each of its franchisees.

30. Dunkin directs its franchisees in California to impose a surcharge for Non-Dairy Alternatives and to adhere to the policies that are subject to this lawsuit. By doing so, Dunkin purposefully avails itself of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of its laws.

31. Defendants Burton Restaurants, LLC, RW Oakland LLC, Madison Food Management, LLC, Golden Gate Restaurant Group LLC are registered in California, have their principal place of business in California and operate retail stores in California.

32. Defendant 6201 Hollywood Donuts LLC is registered in California and operates at least one retail store in California.

33. Plaintiffs Garland, Hughes, Hernandez, and Cojom reside in California. A substantial part of the events or omissions giving rise to the claim occurred in the State of California.

34. Venue is proper in the Northern District of California, pursuant to 28 U.S.C. § 1391(b)(4).

### THE PARTIES

**A.    Plaintiffs**

***Chelsea Garland***

35. Plaintiff Chelsea Garland is and was at all times material a resident of the State of California. Ms. Garland has purchased items, including crafted coffee drinks, at various Dunkin Donuts' locations in San Diego County and throughout the state of California.

36. As a result of her lactose intolerance, Ms. Garland is substantially impaired in several major life activities and is required to consume non-dairy milk alternatives. Ms. Garland has consumed Dunkin Donuts beverages at various Dunkin Donuts stores in California and plans to continue to do so in the future.

37. Ms. Garland has been advised by a medical doctor to avoid any dairy products.

38. Ms. Garland suffers adverse health consequences and physical symptoms if she consumes dairy milk products, including but not limited to, bloating, diarrhea, indigestion, excessive gas, nausea, abdominal pain, cramping and fatigue.

39. Ms. Garland's lactose intolerance affects her daily social activities and work and family activities. She will often have to forego or leave social activities early if she suffers symptoms of her lactose intolerance. She will often have to take multiple restroom breaks while at work, which interrupt and restrict her work schedule.

40. On multiple occasions, Ms. Garland has told the Dunkin Donuts barista/server that she is lactose intolerant and told the server that she cannot consume dairy products. In response, the Dunkin Donuts server has directed Ms. Garland to the Non-Dairy Alternatives listed on the menu board and advised her that she must pay extra for those Non-Dairy Alternatives.

41. On at least one occasion, Ms. Garland has requested the Dunkin Donuts barista/server to waive the Surcharge, but the barista/server declined to do so.

42. Dunkin Donuts stores do not have a hand-printed menu for customers. In those instances, the Dunkin Donuts barista/server would point to the menu board generally on the wall behind the server and advise Ms. Garland to add the Non-Dairy Alternative surcharge to the listed prices, effectively creating a separate, higher-priced menu directed at disabled customers.

***Tonya Hughes***

43. Plaintiff Tonya Hughes is and was at all times material a resident of the State of California. Ms. Hughes has purchased items, including coffee drinks, at various Dunkin Donuts store locations in Alameda County and throughout the state of California.

44. As a result of her lactose intolerance, Ms. Hughes is substantially impaired in several major life activities and is required to consume non-dairy milk alternatives.

45. Ms. Hughes has consumed Dunkin Donuts beverages at various Dunkin Donuts retail stores in California and, despite her disability, was charged the Surcharge.

46. Ms. Hughes and plans to continue to purchase drinks at Dunkin Donuts stores in the future.

*Natasha Hernandez*

47.     Plaintiff Natasha Hernandez is and was at all times material a resident of the State of California. Ms. Hernandez has purchased items, including crafted tea-based and coffee-based drinks, at various Dunkin Donuts stores in Pittsburg County and throughout the state of California.

48.     As a result of her lactose intolerance, Ms. Hernandez is substantially impaired in several major life activities and is required to consume non-dairy milk alternatives.

49.     Ms. Hernandez was diagnosed with lactose intolerance by a medical doctor approximately 4-5 years ago.  She was advised by the doctor to avoid any dairy products including beverages containing milk.

50.     Ms. Hernandez suffers adverse health consequences and physical symptoms if she consumes dairy milk products, including but not limited to, diarrhea, abdominal pain, cramping and fatigue.

51.     Ms. Hernandez's lactose intolerance affects her work and social activities.  If she ingests dairy products, she will usually have to stay home and avoid social activities and family interactions due to the abdominal pain and the fear of having diarrhea in public places.

52.     On many occasions, Ms. Hernandez has informed the Dunkin Donuts barista/server of her lactose intolerance and told the server that she cannot consume dairy products.  In those instances, the Dunkin Donuts server has advised her to choose a drink made with a non-dairy alternative or to substitute a non-dairy alternative for dairy milk in a regular drink.

53.     On at least one occasion, Ms. Garland has requested the Dunkin Donuts barista/server to waive the Surcharge, to which the barista/server declined to do so.

54.     Dunkin Donuts stores do not have a hand-printed menu for customers.  In those instances where Ms. Hernandez has advised the server of her lactose intolerance, the Dunkin Donuts server would point to the menu board, generally on the wall behind the server, and advise Ms. Hernandez to substitute the Non-Dairy Alternative to the listed prices and pay the Surcharge, effectively creating a separate, higher-priced menu directed at disabled customers.

55.     Ms. Hernandez has consumed Dunkin Donuts crafted coffee beverages at various Dunkin Donuts retail stores in California and plans to continue to do so in the future.

FIRST AMENDED CLASS ACTION COMPLAINT

### Geaneen Cojom

56.     Plaintiff Geaneen Cojom is and was at all times material a resident of the State of California. Ms. Cojom has purchased items, including coffee drinks, at various Dunkin Donuts' locations in San Diego County and throughout the state of California.

57.     As a result of her lactose intolerance, Ms. Cojom is substantially impaired in several major life activities and is required to consume non-dairy milk alternatives.

58.     Ms. Cojom has been advised by a medical doctor to avoid milk and dairy products due to her lactose intolerance.

59.     Ms. Cojom will suffer adverse health consequences and physical symptoms if she consumes dairy milk products, including but not limited to, bloating, diarrhea, indigestion, excessive gas, abdominal pain, cramping and fatigue.

60.     Ms. Cojom's lactose intolerance affects her social activities, work and the way she interacts with her family.  When she ingests milk or dairy products, she will develop, among other symptoms, severe stomach pain which makes it difficult to function in the normal daily activities of life, including difficulty sleeping, eating and exercising.

61.     Ms. Cojom has told a Dunkin Donuts barista/server that she cannot consume dairy products due to her lactose intolerance.  In many of those instances, she has been directed by the Dunkin Donuts barista/server to choose a Non-Dairy Alternatives due to her inability to ingest dairy products.

62.     On at least one occasion, Ms. Cojom has requested the Dunkin Donuts barista/server to waive the Surcharge, to which the barista/server declined to do so.

63.     Ms. Cojom has consumed Dunkin Donuts crafted coffee beverages at various Dunkin Donuts retail stores in California and plans to continue to do so in the future.

### Arsenio Pelayo

64.     Plaintiff Arsenio Pelayo is and was at all times material a resident of the State of Hawaii. Mr. Pelayo has purchased items, including coffee drinks, at various Dunkin Donuts locations in Hawaii.

65.     As a result of his lactose intolerance, Mr. Pelayo is substantially impaired in several

major life activities and is required to consume non-dairy milk alternatives.

66.     Mr. Pelayo was diagnosed with lactose intolerance by a medical doctor in 2008 and advised to avoid milk and dairy products due to his lactose intolerance.

67.     Mr. Pelayo will suffer adverse health consequences and physical symptoms if he consumes dairy milk products, including but not limited to, bloating, frequent diarrhea, indigestion, excessive gas, nausea, abdominal pain, cramping, inability to stand, constant blurred vision, impaired motor skills and daily fatigue.

68.     Mr. Pelayo has consumed Dunkin crafted coffee beverages at various Dunkin Donuts retail outlets in California and plans to continue to do so in the future.

***Albert Fitch***

69.     Plaintiff Albert Fitch is and was at all times material a resident of the State of New York. Mr. Fitch has purchased items, including coffee drinks, at various Dunkin' locations in New York.

70.     As a result of his lactose intolerance, Mr. Fitch is substantially impaired in several major life activities and is required to consume non-dairy milk alternatives.

71.     Mr. Fitch has been advised by a medical doctor to avoid milk and dairy products due to his lactose intolerance.

72.     Mr. Fitch will suffer adverse health consequences and physical symptoms if he consumes dairy milk products, including but not limited to, excessive gas, nausea, cramping, and fatigue.

73.     Mr. Fitch's lactose intolerance affects his social activities, work and the way he interacts with his family.  Specifically, ingesting milk or dairy products in the morning affects his work life by making it difficult to focus on his job due to nausea.  Mr. Fitch is a middle school teacher, and it makes it difficult for him to teach class and focus on his students.  Further, cramping and nausea makes it difficult for him to interact with his family.

74.     Mr. Fitch has told a Dunkin Donuts barista/server that he cannot consume dairy products due to his lactose intolerance and that his drinks cannot contain dairy products.

75.     Mr. Fitch has consumed Dunkin Donuts crafted coffee beverages at various Dunkin

Donuts retail stores in New York and plans to continue to do so in the future.

### *Pauleen Mara*

76.     Plaintiff Pauleen Mara is and was at all times material a resident of the State of New York. Ms. Mara has purchased items, including coffee drinks, at various Dunkin Donuts locations in New York.

77.     As a result of her lactose intolerance, Ms. Mara is substantially impaired in several major life activities and is required to consume non-dairy milk alternatives.

78.     Ms. Mara was diagnosed by a medical doctor with lactose intolerance at the age of 18. She has been advised by a medical doctor to avoid dairy products including milk as treatment for her lactose intolerance.

79.     Ms. Mara will suffer adverse health consequences and physical symptoms if she consumes dairy milk products, including but not limited to, bloating, severe gas, severe cramping, and fatigue.

80.     On multiple occasions, Ms. Mara has told a Dunkin Donuts barista/server that she is lactose intolerant and cannot consume dairy milk products.  In response, the Dunkin Donuts barista/server has directed Ms. Mara to the Non-Dairy Alternatives listed on the menu and has advised her that she must pay extra for those Non-Dairy Alternatives.

81.     On at least one occasion, Ms. Mara has requested the Dunkin Donuts barista/server to waive the Surcharge, but the barista/server declined to do so.

82.     Ms. Mara has consumed Dunkin Donuts crafted coffee beverages at various Dunkin Donuts retail stores in New York and plans to continue to do so in the future.

### *Lora Premo*

83.     Plaintiff Lora Premo is and was at all times material a resident of the State of Colorado. Ms. Premo has purchased items, including coffee drinks, at various Dunkin Donuts' locations in Colorado.

84.     As a result of her lactose intolerance and diagnosed milk allergy, Ms. Premo is substantially impaired in several major life activities and is required to consume non-dairy milk alternatives.

85.     In addition to wheezing, vomiting, hives and digestive problems, a milk allergy can also cause anaphylaxis, a severe, life-threatening reaction.

86.     Plaintiff suffers adverse health effects if she ingests milk or dairy products, including severe stomach pain accompanied by cramps, digestive tract inflammation, bowel irregularities, severe intestinal gas and fatigue.

87.     While treatment with Epinephrine may be considered in life-threatening situations, avoiding milk and milk products is the primary treatment for a milk allergy.

88.     As a result, Plaintiff must pay very careful attention to the drinks she consumes and can only consume non-dairy products in drinks that contain Non-Dairy Alternatives.  Ms. Premo's disability limits the major life activities of drinking (and the nutritional benefits from ingesting drinks), and digestion.

89.     Ms. Premo has received medical treatment related to her ingesting milk and has been advised by a medical physician not to consume milk-based products.

90.     Ms. Premo has not shared with a Dunkin barista/server that she has lactose intolerance and a milk allergy.  Ms. Premo believes it would be a violation of her personal privacy rights to have to disclose this sensitive medical information in order to receive an accommodation for her disability.

91.     Ms. Premo has consumed Dunkin Donuts crafted coffee beverages at various Dunkin Donuts retail stores in Colorado and plans to continue to do so in the future.

***Urcelina Medeiros***

92.     Plaintiff Urcelina Medeiros is and was at all times material a resident of the State of Massachusetts. Ms. Medeiros has purchased items, including coffee drinks, at various Dunkin Donuts locations in Massachusetts.

93.     As a result of her lactose intolerance, Ms. Medeiros is substantially impaired in several major life activities and is required to consume non-dairy milk alternatives.

94.     Ms. Medeiros has been advised by a medical doctor to avoid milk and dairy products due to her lactose intolerance.

95.     Ms. Medeiros will suffer adverse health consequences and physical symptoms if she consumes dairy milk products, including but not limited to, bloating, cramping, indigestion, excessive gas, abdominal pain, nausea, cramping, and constipation.

96.     Ms. Medeiros has consumed Dunkin Donuts beverages at various Dunkin Donuts retail stores in Massachusetts and plans to continue to do so in the future.

***Ruby Smith***

97.     Plaintiff Ruby Smith is and was at all times material a resident of the State of Texas. Ms. Smith has purchased items, including coffee drinks, at various Dunkin Donuts' locations in Texas.

98.     As a result of her lactose intolerance, Ms. Smith is substantially impaired in several major life activities and is required to consume non-dairy milk alternatives.

99.     Ms. Smith was diagnosed with lactose intolerance by a medical doctor in 2002 and was advised to avoid milk and/or dairy products.

100.     Ms. Smith will suffer adverse health consequences and physical symptoms if she consumes dairy milk products, including but not limited to, bloating, diarrhea, indigestion, excessive gas, nausea, vomiting, abdominal pain, cramping, inability to stand, and fatigue.

101.     Ms. Smith's lactose intolerance affects her daily activities as ingesting milk or dairy products causes social, emotional and physical impairment.  Due to her physical symptoms, she is restricted from spending time with her family and church group, and at times unable to leave the house or get out of bed to perform daily chores and activities.  Ms. Smith often will suffer depression when she suffers symptoms of her lactose intolerance that will affect her relationship with her only daughter and limit the time she spends with her.

102.     Ms. Smith has told a Dunkin Donuts barista/server that she cannot consume dairy products due to her lactose intolerance.  On at least one occasion, the response from the server was "We have oat milk or almond milk, but it is an upcharge."  Thus, Ms. Smith has been advised by a Dunkin Donuts barista/server to substitute a Non-Dairy Alternative because of her lactose intolerance.

103.     Ms. Smith has had medical treatment related to her lactose intolerance including, but not limited to, an emergency room visit. Ms. Smith has consumed Dunkin Donuts beverages at

various Dunkin Donuts retail outlets in Texas and plans to continue to do so in the future.

**B.     Defendants**

104.     Defendant DUNKIN DONUTS FRANCHISING LLC ("Dunkin") is incorporated in the State of Delaware and its principal place of business is located at 130 Royall Street, Canton, MA 02021. Dunkin supervises the operation of over 9,500 coffee stores in the United States and over 125 in the state of California. Dunkin is a franchisor for Dunkin restaurants around the Country and exercises a high degree of control over its franchisees. Dunkin is registered and in good standing to do business in California.

105.     Defendant 6201 HOLLYWOOD DONUTS LLC ("Hollywood"), is registered as a California Limited Liability Company, with its principal place of business located at 525 Cedar Hill Avenue, Wyckoff, NJ 07481. Hollywood is operating the restaurant located at 6201 Hollywood Blvd., Suite 130, Los Angeles, CA. Hollywood's only member is a citizen of New Jersey, making Hollywood a citizen of New Jersey.

106.     Defendant BURTON RESTAURANTS, LLC ("Burton"), is registered as a California Limited Liability Company, with its principal place of business located at 2560 Progress St., Vista, CA 92081. Burton is operating the restaurants located at 409 Washington St., San Diego, CA 92103 and 2139 East Plaza Blvd., National City, CA 91950.

107.     Defendant RW OAKLAND LLC ("Oakland"), is registered as a California Limited Liability Company, with its principal place of business located at 8250 Calvine Road Suite C-312 Sacramento, CA 95828. Oakland is operating the restaurant located at 451 Hegenberger Road, Oakland, CA 94621.

108.     Defendant MADISON FOOD MANAGEMENT, LLC ("Madison"), is registered as a California Limited Liability Company, with its principal place of business located at 6404 Wilshire Blvd #840 Los Angeles, CA 90048. Madison operates the restaurant located at 754 S. Olive Street, Los Angeles, CA 90014.

109.     Defendant GOLDEN GATE RESTAURANT GROUP LLC ("Golden Gate") is registered as a California Limited Liability Company, with its principal place of business located at 3499 Moraga Blvd Lafayette, CA 94549. Golden State is operating the restaurant located at 4701

Century Blvd., Pittsburg, CA 94565.

**BACKGROUND FACTS**

### *Lactose Intolerance and Milk Allergies*

110.  Plaintiffs are lactose intolerant or have a milk allergy, requiring that they each consume drinks that do not contain lactose or lactose-based products, which includes milk and many milk-containing products.

111.  Plaintiffs will suffer adverse health effects if they ingest milk or milk-containing products, including stomach pain, digestive tract inflammation, bloating, bowel irregularities and vomiting. As a result, Plaintiffs must pay very careful attention to the drinks they consume and can only consume non-dairy products in drinks that contain Non-Dairy Alternatives including lactose-free milk.

112.  Plaintiffs' disability limits the major life activities of drinking (and the nutritional benefits from ingesting drinks), and digestion.

113.  Lactose intolerance is a disability that makes it difficult to digest lactose. Lactose is a type of natural sugar found in milk and dairy products.

114.  When lactose moves through the large intestine without being properly digested, it can cause gas, bloating, belly pain and diarrhea. Many people who have a lactose intolerance cannot eat or drink any amount of milk or milk-containing products.

115.  Persons with lactose intolerance and milk allergies experience various levels of reactions to the ingestion of milk and milk-containing products, including a bloated stomach, intestinal gas, nausea and vomiting, stomach pain and cramping, and diarrhea.

116.  Lactose intolerance occurs when the small intestine does not make enough of an enzyme called lactase. The body needs lactase to break down and digest lactose. A person's body may stop making lactase after a short-term illness such as an infection or as part of a lifelong chronic disease such as cystic fibrosis.

117.  A dairy allergy, or milk allergy, occurs when the immune system overreacts to the presence of proteins in milk. When a person with a dairy allergy encounters products containing dairy, it results in their immune system overreacting.

FIRST AMENDED CLASS ACTION COMPLAINT

118.    A main type of milk allergy, Immunoglobulin E (IgE) refers to a type of antibody that the immune system may produce after recognizing a foreign substance, the presence of milk and dairy products.

119.    With IgE, the immune system mistakenly determines that dairy proteins are harmful and responds by releasing chemicals, such as histamine. This release of chemicals causes symptoms of an allergic response, which occur immediately. The symptoms may include swelling, breathing problems, rashes, loss of consciousness and anaphylaxis.

120.    A second type of milk allergy, non-IgE, may be confused with lactose intolerance in some people because often reactions do not appear as quickly and can cause gastrointestinal systems such as vomiting, bloating and diarrhea.

121.    Because of their milk allergies, Plaintiffs must order Non-Dairy Alternatives at Dunkin such as soy, almond, coconut, oat, or other lactose-free "milk." Plaintiffs have, on every occasion, been levied the Surcharge by Defendants for Non-Dairy Alternatives in their coffee drinks ordered and consumed from Defendants.

122.    stores in numerous states, including California, Colorado, Massachusetts, Texas, New York and Hawaii.

123.    The Non-Dairy Alternative Surcharge has real and practical consequences for consumers suffering from lactose intolerance and milk allergies. A consumer will pay at least $0.50-$2.15 more for a coffee-based drink at Dunkin for Non-Dairy Alternatives. Non-Dairy Alternatives, which do not contain lactose, are medically necessary for individuals with lactose intolerance and milk allergies. For those persons, the use of these Non-Dairy Alternatives is not a choice.

124.    And this surcharge is not justified by the costs of the Non-Dairy Alternatives.  There is no additional labor costs associated with using a Non-Dairy Alternative in a beverage. Additionally, the retail cost of Non-Dairy Alternatives is not significantly more than dairy products (if at all).  For example, as of the filing of this complaint, Whole Milk was priced at between $0.03-05 per fluid ounce, Half & Half between $0.09-19 per fluid ounce, and Heavy Cream between $0.17-32 per fluid ounce.  Yet, coconut, oat and soy milk only sell for between $0.06-07 per fluid ounce. Similarly, almond milk sells for between $0.04-07 per fluid ounce.  Accordingly, the retail price of

Whole Milk, Half & Half, and Heavy Cream (which is provided for free by Defendant) is the same, if not more, than their Non-Dairy Alternatives.

125. Accordingly, Non-Dairy Alternative Surcharges are not to defray the added costs of use of these ingredients. Instead, the Surcharges are designed to profit from those consumers with lactose intolerance and milk allergies. Indeed, only Non-Dairy Alternatives incur a surcharge, when cream may be more expensive than any other Non-Dairy Alternative.

126. Without the availability of Non-Dairy Alternative options, consumers with lactose intolerance and milk allergies are deprived of the opportunity to enjoy consuming Dunkin Donuts' coffee beverages and drinks with their friends, family, and business associates.

127. Various studies in the United States concluded that the portion of the U.S. population that is lactose intolerant is at least 12% and may be as high as 48%.

128. Lactose intolerance is common in adults, almost 30 million persons in the United States have it by the age of 20.

129. Dairy allergies are one of the most common allergies. In the United States, greater than 15 million people have a milk or dairy allergy.

***The Dunkin Donuts Coffee Experience***

130. Upon information and belief, Dunkin Donuts sells approximately 3 million coffee-based drinks per day.

131. Defendants offer many different varieties of crafted coffee drinks that are available for purchase by Plaintiffs and Class Members.

132. For example, Defendants offer an Iced Signature Latte, which is made with rich espresso and regular dairy milk, and including whipped cream, drizzle and other toppings.

133. During certain times of the year, Defendants may offer specialty Signature Latte coffee drinks including a Pumpkin Spice Latte during the Fall or a Signature Peppermint Latte during the winter holidays. Each of these specialty coffee drinks are also made with regular dairy milk as one of its main ingredients.

134. If a consumer, including Plaintiffs and Class Members, wanted an Iced Signature Latte with whole milk or skim milk, there would be no additional charge.

- 17 -

135.    However, if a consumer, including Plaintiffs and Class Members, wanted an Iced Signature Latte with oat milk, almond milk or some other Non-Dairy Alternatives, they would be charged an extra Surcharge for the Non-Dairy Alternative.

136.    Defendants created a separate and higher priced dairy-free menu targeted to persons with lactose intolerance or milk allergies, because Defendants accommodate other customer dietary preferences and allergies free of charge but impose a surcharge only on persons with lactose intolerance or milk allergies.

137.    Part of the experience of going to Defendants' stores is ordering their specialty crafted coffee drinks, most of which include milk products.  After all, most people who want to order plain black coffee or tea can just as easily make it at home rather than go out to a store for it.

138.    Thus, in order to fully enjoy this experience, disabled individuals with a milk allergy or lactose intolerance should be able to substitute the dairy milk in these drinks for non-dairy milk at the same cost, but under Defendants' current policy, disabled individuals are required to choose between foregoing traditionally dairy-based specialty drinks, adding dairy to their drinks and experiencing serious medical symptoms, or paying extra for their drinks.  This is not a "like experience" and diminishes their enjoyment.

139.    Nondisabled individuals are able to enjoy their coffee and tea at a 20% lower price than disabled individuals.  And individuals with health issues that require them to substitute decaf for caffeinated coffee or sugar-free syrup for sugar are also able to enjoy their coffee or tea without paying extra for these substitutions.

140.    As alleged above, Defendants offer modifications to non-disabled customers free of charge.  For example, they allow substitutions of decaf for caffeinated coffee, sugar-free syrup for regular syrup, and one type of dairy milk for another dairy milk, but they fail to offer persons with lactose intolerance similar non-dairy substitutions for dairy milk free of charge. There is no difference in cost of non-dairy milk as compared to dairy milk that justifies such charge, and the preparation of each drink with non-dairy milk is exactly the same as when the drink is made with dairy other than the use of non-dairy milk.

141.    Upon information and belief, Defendants are disproportionately profiting from their

customers with lactose intolerance and milk allergies as compared to customers who do not have lactose intolerance and milk allergies. Unlike other businesses that spread the cost of providing accommodations to disabled persons amongst every consumer, Defendants here places the cost of providing accommodations primarily on persons with lactose intolerance and milk allergies.

142. Consumers, including the Plaintiffs and Class Members, can order Dunkin Donuts crafted coffee drinks through a mobile ordering application owned, operated and maintained by Dunkin or one of its corporate affiliates ("Dunkin Mobile App").

143. The Dunkin Mobile App may direct customers to Dunkin franchisees based on the location of the customer. Dunkin maintains location and other information on its franchisees, including the Franchisees in this case, in its Dunkin Mobile App.

144. The Dunkin Mobile App is used to collect payments for Dunkin Donuts purchases, including crafted coffee drinks. The Dunkin Mobile App contains pricing information including pricing for the Surcharge at its individual franchisees, including the Franchisees in this case.

145. Upon information and belief, Dunkin, either directly or through one of its corporate affiliates, has collected payments for the Surcharge through its Dunkin Mobile App.

146. Dunkin, either directly or through one of its corporate affiliates, maintains a website, https://dunkindonuts.com. This website is used, in part, for the marketing and sale of crafted coffee drinks in Dunkin Donuts stores, including the Franchisees in this case. In particular, the Dunkin website has location information that will allow a consumer to put in his or her address and then be directed to a particular Dunkin Donuts store near the consumer. The Dunkin website will also show what specific coffee drinks and other products are available for purchase at a particular Dunkin Donuts store location.

147. Thus, there is significant control and coordination of the consumer ordering experience by Dunkin through the Dunkin website and the Dunkin Mobile App. This includes control and coordination of the charging and payment of the Surcharge for Non-Dairy Alternatives.

148. Upon information and belief, Dunkin and its related corporate entities had annual revenue in 2021 exceeded $1.4 billion dollars.

149. Dunkin is one of the largest coffee chains in the world.

FIRST AMENDED CLASS ACTION COMPLAINT

150. Because of its size, Dunkin has the power to control the manufacturing costs for Non-Dairy Alternatives.

151. Based on the franchising agreements signed with the owners of the restaurants, including the Franchisees, Dunkin shares the profits obtained from imposing the Surcharge as it gets a percentage of the Surcharge each time it is levied.

152. Upon information and belief, Dunkin has earned over $100 million dollars in the United States as a result of its discriminatory and illegal levying of the Surcharge during the Class Period.

153. Dunkin imposes a charge and directs each Franchisee implement it for replacing milk with Non-Dairy Alternatives and recommends that each franchisee charges at least US $0.50 "upcharge" for any espresso-based drink that incorporates any Non-Dairy Alternative.

154. The Franchisees levied the illegal charge to every disabled customer during the class period (defined below).

### CLASS ALLEGATIONS

155. Plaintiff brings this action as a class pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of the following classes:

**National Class**: All persons who (1) suffer from lactose intolerance, or an intolerance to milk or milk-containing products; and (2) who purchased drinks or other items from Dunkin within four years prior to the filing of the Complaint and continuing to the present. The National Class is represented by all named Plaintiffs.

**California Subclass**: All persons who (1) are citizens of California; (2) suffer from lactose intolerance, or an intolerance to milk or milk-containing products; and (3) who purchased drinks or other items from Dunkin in California within two years prior to the filing of the Complaint and continuing to the present. The California Class is represented by Chelsea Garland, Tonya Hughes, Natasha Hernandez, and Geaneen Cojom.

**Burton Subclass:** All persons who (1) are citizens of California; (2) suffer from lactose intolerance, or an intolerance to milk or milk-containing products; and (3) who purchased drinks or other items from a location operated by Burton Restaurants LLC within two years prior to the filing of the Complaint and continuing to the present. The Burton Subclass is represented by Chelsea Garland.

**Hollywood Subclass:** All persons who (1) are citizens of California; (2) suffer from lactose intolerance, or an intolerance to milk or milk-containing products; and (3) who purchased drinks or other items from a location operated by 6201 Hollywood Donuts

LLC within two years prior to the filing of the Complaint and continuing to the present. The Hollywood Subclass is represented by Geaneen Cojom.

**Oakland Subclass:** All persons who (1) are citizens of California; (2) suffer from lactose intolerance, or an intolerance to milk or milk-containing products; and (3) who purchased drinks or other items from a location operated by RW Oakland LLC within two years prior to the filing of the Complaint and continuing to the present. The Oakland Subclass is represented by Tonya Hughes.

**Madison Subclass:** All persons who (1) are citizens of California; (2) suffer from lactose intolerance, or an intolerance to milk or milk-containing products; and (3) who purchased drinks or other items from a location operated by Madison Food Management LLC within two years prior to the filing of the Complaint and continuing to the present. The Madison Subclass is represented by Geaneen Cojom.

**Golden Gate Subclass:** All persons who (1) are citizens of California; (2) suffer from lactose intolerance, or an intolerance to milk or milk-containing products; and (3) who purchased drinks or other items from a location operated by Golden Gate Restaurant Group LLC within two years prior to the filing of the Complaint and continuing to the present. The Golden Gate Subclass is represented by Natasha Hernandez.

**Hawaii Subclass**: All persons who (1) are citizens of Hawaii; (2) suffer from lactose intolerance, or an intolerance to milk or milk-containing products; and (3) who purchased drinks or other items from Dunkin in Hawaii within two years prior to the filing of the Complaint and continuing to the present. The Hawaii Subclass is represented by Arsenio Pelayo.

**New York Subclass**: All persons who (1) are citizens of New York; (2) suffer from lactose intolerance, or an intolerance to milk or milk-containing products; and (3) who purchased drinks or other items from Dunkin in New York within two years prior to the filing of the Complaint and continuing to the present. The New York Subclass is represented by Albert Fitch and Pauleen Mara.

**Colorado Subclass**: All persons who (1) are citizens of Colorado; (2) suffer from lactose intolerance, or an intolerance to milk or milk-containing products; and (3) who purchased drinks or other items from Dunkin in Colorado within two years prior to the filing of the Complaint and continuing to the present. The Colorado Subclass is represented by Lora Premo.

**Massachusetts Subclass**: All persons who (1) are citizens of Massachusetts; (2) suffer from lactose intolerance, or an intolerance to milk or milk-containing products; and (3) who purchased drinks or other items from Dunkin in Massachusetts within two years prior to the filing of the Complaint and continuing to the present. The Massachusetts Subclass is represented by Urcelina Medeiros.

**Texas Subclass**: All persons who (1) are citizens of Texas; (2) suffer from lactose intolerance, or an intolerance to milk or milk-containing products; and (3) who purchased drinks or other items from Dunkin in Texas within two years prior to the filing of the Complaint and continuing to the present. . The Texas Subclass is represented by Ruby Smith.

156.     The classes exclude counsel representing the class, governmental entities, Defendants, any entity in which Defendants have a controlling interest, Defendants' officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns, any judicial officer presiding over this matter, the members of their immediate families and judicial staff, and any individual whose interests are antagonistic to other putative class members

157.     Plaintiffs reserve the right to amend or modify the class descriptions with greater particularity or further division into subclasses or limitation to particular issues.

158.     This action has been brought and may properly be maintained as a class action under Federal Rule of Civil Procedure 23 because there is a well-defined community of interest in the litigation and the class is readily and easily ascertainable.

159.     The potential members of the class are so numerous that joinder of all members of the class is impractical. Although the precise number of putative class members has not been determined at this time, Plaintiffs are informed and believe that the proposed classes include hundreds of thousands of members.

160.     There are common questions of law and fact that predominate over any questions affecting only individual putative class members.

161.     Plaintiffs' claims are typical of the claims of the members of the putative class because Plaintiffs ordered and consumed drinks at Defendants' stores, ordered Non-Dairy Alternatives and incurred a Surcharge for that alternative milk during the applicable class period. Plaintiffs and each class member sustained similar injuries arising out of Defendants' conduct in violation of law. The injuries of each member of the class were caused directly by Defendants' wrongful conduct. In addition, the factual underpinning of Defendants' misconduct is common to all members of the putative classes and subclasses and represents a common thread of misconduct resulting in injury to all members of the class. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of putative class members and are based on the same legal theory.

162.     A class action is superior to other available means for the fair and efficient adjudication of this controversy. Individual joinder of putative class members is not practicable and questions of law and fact common to the class members predominate over any questions affecting only individual

putative class members.

163. Each member of each putative class and subclass has been damaged and is entitled to recovery by reason of Defendants' illegal acts.

164. Class action treatment will allow those similarly situated to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system.

165. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

166. The disposition of all claims of the members of the class in a class action, rather than individual actions, benefits the parties and the Court. The interests of the class members in controlling prosecution of separate claims against the Defendants is small when compared to the efficiency of a class action.

167. Plaintiffs will fairly and adequately represent and protect the interests of the class. Plaintiffs' Counsel and for the putative class members are experienced and competent in litigating class actions.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF TITLE III OF AMERICANS
### WITH DISABILITIES ACT
(On Behalf of all Plaintiffs and all other similarly situated National Class Members)

168. The allegations contained in Paragraphs 1-167 of the Complaint are incorporated by reference as if fully set out herein.

169. Plaintiffs assert this count on their own behalf and on behalf of all other similarly situated persons members of the National Class.

170. Franchisees are public accommodations under the Americans with Disabilities Act ("ADA"), *see* 42 U.S.C. § 12181 (7)(B), and consequently Franchisees are prohibited from discriminating against Plaintiffs and other members of the putative class on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges and advantages provided by Franchisees.

171. Franchisees are agents of Dunkin in California, implementing the procedures set by

Dunkin and selling products as directed by Dunkin. Dunkin directs the Franchisees to charge a fee for "Add Almond/Oat/Coconut Milk" and suggests that the Franchisees charge $0.50. As such Dunkin is subject to *see* 42 U.S.C. § 12181 (7)(B).

172. The ADA requires that a "public accommodation shall make reasonable modifications in policies, practices, or procedures, when the modifications are necessary to afford good, services, facilities, privileges, advantages or accommodations to individuals with disabilities[.]". 28 C.F.R. § 36.302(a). *See also* 42 U.S.C. § 12182(b)(2)(A)(ii) (stating that discrimination includes failing to make reasonable modifications when necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities).

173. The ADA makes it discriminatory to afford an individual or class of individuals, on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements with the opportunity to participate in or benefit from a good, service, facility, privilege, advantage or accommodation that is not equal to that afforded to other individuals[.]" 42 U.S.C. § 12182(a)(i). *See also* 42 U.S.C. § 12182(b)(i) (making it discriminatory for a public accommodation to deny disabled persons the opportunity to participate in or benefit from goods, services, privileges, advantages, or accommodations).

174. The ADA requires that a "public accommodation shall make reasonable modifications in policies, practices, or procedures, when the modifications are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities[.]" 28 C.F.R. § 36.302(a).

175. Under the ADA, if an establishment already makes alterations or modifications, or takes special orders for its customers, it must do so for the disabled customer requests as well. *See* 28 C.F.R. § 36.307(a) & (b) ("A public accommodation shall order accessible or special goods at the request of an individual with disabilities, if, in the normal course of its operation, it makes special orders on requests for unstocked goods, and if the accessible or special goods can be obtained from a supplier with who the public accommodation customarily does business.").

176. Most importantly, the ADA provides that a "public accommodation may not impose a surcharge on a particular individual with a disability or any group of individuals with disabilities to

cover the costs of measures, such as the provision of auxiliary aids, barrier removal, alternatives to barrier removal, and reasonable modifications in policies, practices, or procedures, that are required to provide that individual or group with the nondiscriminatory treatment required by the Act or this part." 28 C.F.R. § 36.301.

177.    The ADA Amendments Act of 2008 ("ADAAA") was passed to restore the intent and protections of the Americans with Disabilities Act of 1990. The ADAAA contained specific Congressional Findings that the amendments were intended to address and reject United States Supreme Court decisions that had incorrectly found in individual cases that people with a range of substantially limiting impairments are not people with disabilities. Specifically, the ADAAA cited to the following holdings as having been incorrectly decided: 1) *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999); and 2) *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002).

178.    The clear Congressional intent of the ADAAA was to expand and broaden the disabilities that are included for protection under the ADA.

179.    Section 4(a) of the ADAAA amends Section 3 of the ADA to include the following language under Section 4 Rules of Construction Regarding the Definition of Disability: (A) the definition of disability in this Act shall be construed in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this Act.

180.    Lactose intolerance is a disability under the ADA. The ADA defines a disability, in pertinent part, as "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1). An impairment means "[a]ny physiological disorder or condition that affects "one or more body systems," such as the neurological, digestive, or immune systems. 28 C.F.R. 36.105(b)(1)(i). An impairment is a disability if it "substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population."

181.    Drinking beverages, including coffee drinks, is a major life activity.

182.    Digestion is a major and vital life activity.

183.    Defendants violate the ADA because, as alleged above, they fail to make modifications to persons with lactose intolerance but instead impose a surcharge on this group of persons,

purportedly to cover the costs of such measures, even though there is no material difference between the costs of regular milk and Non-Dairy Alternatives.

184.     As a direct result of Defendants' violation of the ADA, Plaintiffs and class members have suffered injury, including but not limited to the violation of their statutory rights and loss of money as a result of Defendants' illegal price discrimination. Therefore, Plaintiffs and the putative class members are entitled to damages and injunctive relief.

185.     The Surcharge constitutes intentional discrimination against persons with lactose intolerance or milk allergies because Defendants created a separate and higher priced dairy-free menu targeted to persons with lactose intolerance or milk allergies and because Defendants accommodate other customer dietary preferences and allergies free of charge but impose a surcharge only on persons with lactose intolerance or milk allergies.

186.     Moreover, also as alleged above, Defendants offer modifications to non-disabled customers free of charge. For example, they allow substitutions of decaf for caffeinated coffee, sugar-free syrup for regular syrup, and one type of dairy milk for another dairy milk, but it fail to offer persons with lactose intolerance similar non-dairy substitutions for dairy milk free of charge. There is no material difference in cost of non-dairy milk as compared to dairy milk that justifies such charge, and the preparation of each drink with non-dairy milk is exactly the same as when the drink is made with dairy other than the use of non-dairy milk.

187.     Upon information and belief, Defendant is disproportionately profiting from their customers with lactose intolerance and milk allergies as compared to customers who do not have lactose intolerance and milk allergies. Unlike other businesses that spread the cost of providing accommodations to disabled persons amongst every consumer, Defendant here places the cost of providing accommodations primarily on persons with lactose intolerance and milk allergies.

188.     Defendants' actions were willful, wanton, malicious, and intentional, and were done in willful and conscious disregard of the rights of Plaintiffs and the putative class members. Defendants' actions were done with the express knowledge, consent, and ratification of Defendants' managerial employees and thereby justify the awarding of punitive and exemplary damages in an amount to be determined at trial.

**COUNT II**
**VIOLATION OF CALIFORNIA'S UNRUH**
**CIVIL RIGHTS ACT (CA)**
(On Behalf of Chelsea Garland, Geaneen Cojom, Tonya Hughes,
Natasha Hernandez, and all other similarly situated California Subclass Members, Burton Subclass
Members, Hollywood Subclass Members, Oakland Subclass Members, Madison Subclass Members
and Golden Gate Subclass Members against each of the respective defendants)

189.    The allegations contained in paragraphs 1-167 of this First Amended Complaint are incorporated by reference as if fully set out herein. Plaintiffs Chelsea Garland and Geaneen Cojom, Tonya Hughes, and Natasha Hernandez assert this count on their own behalf and on behalf of the California subclass, as defined above against Defendants. Plaintiff Chelsea Garland and the Burton Subclass assert this claim against Burton. Plaintiff Geaneen Cojom and the Hollywood Subclass assert this claim against Hollywood. Plaintiff Geaneen Cojom and the Madison Subclass assert this claim against Madison. Plaintiff Natasha Hernandez and the Golden Gate Subclass assert this claim against Golden Gate. Plaintiff Tonya Hughes and the Oakland Subclass assert this claim against Oakland.

190.    California's Unruh Act provides, "All persons within the jurisdiction of this state are free and equal, and no matter their sex, race, color, religion, ancestry, national origin, disability, medical condition, marital status, or sexual orientation are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." Cal. Civ. Code § 51(b).

191.    The Unruh Act prohibits businesses from engaging in unreasonable, arbitrary, or invidious discrimination, including through the unequal treatment of patrons. For example, businesses may not offer discounts to some classes of patrons but require full price from other patrons, where the price difference is based on arbitrary, class-based generalizations (such as gender).

192.    The Unruh Act provides that whoever "denies, aids or incites a denial, or makes any discrimination or distinction contrary to [the Act]" is liable for each and every offense, up to three times the amount of actual damages but in no case less than $4,000 plus attorneys' fees. *Id* at § 52(a).

193.    Defendants' conduct constitutes a violation of California's Unruh Act, Cal. Civ. Code § 51, *et seq.* Defendants' practice of surcharging Non-Dairy Alternatives purchased by consumers who are lactose intolerant or have milk allergies constitutes price discrimination in violation of the

Unruh Act.

**Intentional Discrimination**

194.    The Surcharge constitutes intentional discrimination against persons with lactose intolerance. Defendants created and implemented a surcharge targeted to persons with lactose intolerance, including directing those persons to a separate dairy-free menu. Defendants accommodate other customers' dietary preferences and allergies free of charge but impose a surcharge only on persons with lactose intolerance.

195.    As alleged above, Defendants provide modifications or substitutes for persons with heart conditions (caffeine-free) or diabetes (sugar-free) at no additional charge. Consumers with these dietary preferences pay no additional money for the accommodations Defendants afford them.

196.    Consumers who need Non-Dairy Alternatives because of their disability, specifically lactose intolerance and milk allergy, are targeted for the Surcharge because of their specific medical condition.

197.    Defendants are making a choice to impose the Surcharge for necessary beverage modifications for one class of persons with a specific disability, lactose intolerance, while at the same time not imposing any extra charge for those persons with another medical condition. This is the essence of intentional discrimination.

198.    Defendants are disproportionately profiting from their customers with lactose intolerance.

199.    Defendants' Surcharge greatly exceeds the amount of any minimal difference in costs associated with Non-Dairy Alternatives.

200.    Defendants' Surcharge is the same for all Non-Dairy Alternatives, making no distinction among the costs of the different Non-Dairy Alternatives.

201.    Defendants are intentionally profiting from the sale of Non-Dairy Alternatives at the expense of those persons with lactose intolerance.

**Violations of the ADA**

202.    A violation of the federal Americans with Disabilities Act (*see* 42 U.S.C. § 12111(9), 42 U.S.C. § 12182(a)) also constitutes a violation of the Unruh Act, Cal Civ. Code § 51(f).

203.    Defendants are public accommodations under the ADA, (*see* 42 U.S.C. § 12181(7)(B), and consequently Defendants are prohibited from discriminating against Plaintiffs and other members of the putative class on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, and advantages offered by Defendants.

204.    The ADA requires that "a public accommodation shall make reasonable modifications in policies, practices, or procedures, when the modifications are necessary to afford good, services, facilities, privileges, advantages, or accommodations to individuals with disabilities[.]" 28 C.F.R. 36.302(a). *See also* 42 U.S.C. § 12182(b)(2)(A)(ii) (stating that discrimination includes failing to make reasonable modifications when necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities).

205.    The ADA makes it "discriminatory to afford an individual or class of individuals, on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements with the opportunity to participate in or benefit form a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded to other individuals[.]". 42 U.S.C. § 12182(a)(i). *See also* 42 U.S.C. § 12182(b)(i) (making it discriminatory for a public accommodation to deny disabled persons the opportunity to participate in or benefit from goods, services, privileges, advantages or accommodations).

206.    The ADA requires that "a public accommodation shall make reasonable modifications in policies, practices, or procedures, when the modifications are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities[.]" 28 C.F.R. § 36.302(a).

207.    Under the ADA, if an establishment already makes alterations or modifications, or takes special orders for its customers, it must do so for disabled customer requests as well. *See* 28 C.F.R. § 36.307(a) & (b) ("A public accommodation shall order accessible or special goods at the request of an individual with disabilities, if, in the normal course of its operation, it makes special orders on request for unstacked goods, and if the accessible or special goods can be obtained from a supplier with whom the public accommodation customarily does business."). Special foods are expressly included among special orders. *See* 28 C.F.R. § 36.307(c) ("Examples of accessible or

special goods includes items such as Braille versions of books, books on audio cassettes, closed-captioned video tapes, special sizes or lines of clothing, and special foods to meet particular dietary needs.")

208. Importantly, the ADA provides that "a public accommodation may not impose a surcharge on a particular individual with a disability or any group of individuals with disabilities to cover the costs of measures, such as the provision of auxiliary aids, barrier removal, alternatives to barrier removal, and reasonable modifications in policies, practices, or procedures, that are required to provide that individual or group with the nondiscriminatory treatment required by the Act or this part." 28 C.F.R. § 36.301.

209. Defendants violate the ADA because, as alleged above, they fail to make modifications that are necessary to afford goods and services to persons with lactose intolerance and milk allergies but instead impose a surcharge on this group, purportedly to cover the cost of such measures.

210. Moreover, also as alleged above, although Defendants already offer modifications to non-disabled customers free of charge, they fail to offer persons with lactose intolerance these same goods and services free of charge.

211. Finally, Defendants' policy of charging all customers a surcharge for Non-Dairy Alternatives disproportionately affects persons with lactose intolerance, regardless of any express intent by Defendants to discriminate against this group.

212. As a direct and proximate cause of Defendants' violation of the Unruh Act, Plaintiffs Chelsea Garland, Geaneen Cojom, Tonya Hughes, Natasha Hernandez, and the members of the Subclasses they represent have suffered injury, including but not limited to the violation of their statutory rights and loss of money as the result of the illegal Surcharge. Therefore, they are entitled to damages and injunctive relief.

213. The aforementioned acts of Defendants were willful, wanton, malicious, intentional, oppressive, and despicable and were done in willful and conscious disregard of the rights of Plaintiffs and class members, and were done by managerial agents and employees of Defendants, or with the express knowledge, consent, and ratification of managerial employees of Defendants, and thereby justify the awarding of punitive and exemplary damages in an amount to be determined at the time of

the trial.

214. The Surcharge constitutes intentional discrimination against persons with lactose intolerance or milk allergies because Defendants created a separate and higher priced dairy-free menu targeted to persons with lactose intolerance or milk allergies and because Defendants accommodate other customer dietary preferences and allergies free of charge but impose a surcharge only on persons with lactose intolerance or milk allergies.

215. Moreover, also as alleged above, Defendants offer modifications to non-disabled customers free of charge. For example, they allow substitutions of decaf for caffeinated coffee, sugar-free syrup for regular syrup, and one type of dairy milk for another dairy milk, but it fail to offer persons with lactose intolerance similar non-dairy substitutions for dairy milk free of charge. There is no material difference in cost of non-dairy milk as compared to dairy milk that justifies such charge, and the preparation of each drink with non-dairy milk is exactly the same as when the drink is made with dairy other than the use of non-dairy milk.

216. Upon information and belief, Defendants are disproportionately profiting from their customers with lactose intolerance and milk allergies as compared to customers who do not have lactose intolerance and milk allergies. Unlike other businesses that spread the cost of providing accommodations to disabled persons amongst every consumer, Defendant here places the cost of providing accommodations primarily on persons with lactose intolerance and milk allergies.

217. Under the Unruh Act, Plaintiffs are entitled to recover actual damages and an amount up to three times the actual damages for each violation of the Unruh Act, "but in no case less than $4,000…" for each and every offense (Cal. Civ. Code § 52(a).

218. Plaintiffs Chelsea Garland, Geaneen Cojom, Tonya Hughes, Natasha Hernandez, and the members of the Subclasses they represent are entitled to actual and treble damages for Defendants' violation of the Unruh Act.

## COUNT III
## HAWAII DISCRIMINATION
(On Behalf of Plaintiff Arsenio Pelayo and Hawaii Subclass Members
for violation of Hawaii Revised Statutes, Chapter 489 against Dunkin)

219. Plaintiff Pelayo realleges and incorporates by reference the allegations in paragraphs

1-167 of this First Amended Complaint as if fully set forth herein.

220. Hawaii law prohibits "unfair discriminatory practices which deny, or attempt to deny, a person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation on the basis of race, sex, color, religion, ancestry, or disability…" Haw. Rev. Stat. § 489-3.

221. "Place of public accommodation means a business … of any kind whose goods, services, facilities, privileges, advantages, or accommodations are extended, offered, sold or otherwise made available to the general public as customers, clients, or visitors." *Id* at § 489-2. The list of examples includes "any establishment that sells goods or services at retail." *Id* at § 489-2(4).

222. Dunkin stores are places of public accommodation as defined in the statute. *See* § 489-2.

223. Plaintiff Pelayo and the Hawaii Subclass Members who were levied the Surcharge for Non-Dairy Alternatives at Dunkin retail stores seek minimum damages under § 489-7.5(a)(1).

224. Defendants' Surcharge for Non-Dairy Alternatives discriminates against people with disabilities and, through their actions described herein, Defendants have directly denied to Plaintiff Pelayo and the Hawaii Subclass Members, because of their disabilities, the full and equal enjoyment of their goods, services, privileges, advantages and accommodations.

225. Plaintiff Pelayo and the Hawaii Subclass Members have been damaged and will continue to be damaged by this discrimination as more fully set forth herein.

<u>**COUNT IV**</u>
**NEW YORK DISCRIMINATION**
(On Behalf of Plaintiffs Albert Fitch, Pauleen Mara
and New York Subclass Members for violation of New York Civil Rights Law against Dunkin)

226. Plaintiffs Fitch and Mara reallege and incorporate by reference the allegations in paragraphs 1-167 of this First Amended Complaint as if fully set forth herein.

227. New York states that "[a]ll persons within the jurisdiction of this state shall be entitled to the full and equal accommodations, advantages, facilities and privileges of any places of public accommodations…" *N.Y. Civ. Rights § 40.*

228. New York prohibits "any person … because of the race, creed, color, national origin,

FIRST AMENDED CLASS ACTION COMPLAINT

sexual orientation, military status, sex, or disability or marital status of any person, directly or indirectly … [to deny] such person any of the accommodations, advantages, facilities, or privileges thereof…" N.Y. Exec § 296(2)(a).

229. A place of public accommodation "shall be deemed to include … retail stores and establishments …" N.Y. Civ. Rights § 40.

230. Dunkin stores are a place of public accommodation as defined in § 40.

231. Plaintiffs Fitch and Mara, and the New York Subclass Members who were charged the Surcharge for Non-Dairy Alternatives, seek minimum statutory damages under § 40-d.

232. Dunkin's imposed Surcharge for Non-Dairy Alternatives discriminates against people with disabilities and, through their actions described herein, Defendants have directly denied to Plaintiffs Fitch, Mara and the New York Subclass Members, because of their disabilities, the full and equal enjoyment of their goods, services, privileges, advantages and accommodations.

233. Plaintiffs Fitch, Mara, and the New York Subclass Members have been damaged and will continue to be damaged by this discrimination as more fully set forth herein.

## COUNT V
## MASSACHUSETTS DISCRIMINATION
(On Behalf of Plaintiff Urcelina Medeiros and Massachusetts
Subclass Members for violation of Massachusetts Anti-Discrimination Law)

234. Plaintiff Medeiros realleges and incorporates by reference the allegations in paragraphs 1-167 of this First Amended Complaint as if fully set forth herein.

235. Massachusetts prohibits "… any distinction, discrimination or restriction on account of physical or mental disability, … [in] his treatment in any place of public accommodation…" *Mass Gen. Laws ch. 272, § 98*.

236. A place of public accommodation is any place "which is open to and accepts or solicits the patronage of the general public" and includes a "retail store or establishment." *Id.* 272, §§ 92A & 92A(3).

237. Dunkin stores are a public accommodation as defined in 272, §§ 92A.

238. Plaintiff Mederios and the Massachusetts Subclass Members who were charged the

Surcharge for Non-Dairy Alternatives seek minimum statutory damages under 272, § 98.

239.   Dunkin's imposition of the Surcharge for Non-Dairy Alternatives discriminates against people with disabilities and, through their actions described herein, Defendants have, directly denied to Plaintiff Medeiros, and the Massachusetts Subclass Members, because of their disabilities, the full and equal enjoyment of their goods, services, privileges, advantages and accommodations.

240.   Plaintiff Medeiros and the Massachusetts Subclass Members have been damaged and will continue to be damaged by this discrimination as more fully set forth herein.

<u>COUNT VI</u>
**COLORADO DISCRIMINATION**
(on behalf of Plaintiff Lora Premo and Colorado Subclass
Members for violation of Colorado Anti-Discrimination Act against Dunkin)

241.   Plaintiff Premo realleges and incorporates by reference the allegations in paragraphs 1-167 of this First Amended Complaint as if fully set forth herein.

242.   The Colorado Anti-Discrimination Act ("CADA") states, "It is a discriminatory practice and unlawful for a person, directly or indirectly, to refuse withhold from, or deny to an individual or a group, because of disability, race, creed, color, sex, marital status, national origin, or ancestry, the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation …" Colo. Rev. Stat. § 24-34-601(2).

243.   CADA defines a "place of public accommodation" to include "any place of business engaged in any sales to the public and any place offering services, facilities, privileges, advantages, or accommodations to the public, including but not limited to any business offering wholesale or retail sales to the public…" *Id*. § 24-34-601(1).

244.   Dunkin stores are places of public accommodation as defined in CADA. Defendants are prohibited from discriminating against Plaintiff and other members of the putative class on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, and advantages offered by Defendants.

245.   Plaintiff Premo and the Colorado Subclass Members who were charged the Surcharge for Non-Dairy Alternatives seek minimum statutory damages under § 24-34-602.

246.   Dunkin's imposition of the Surcharge for Non-Dairy Alternatives discriminates

FIRST AMENDED CLASS ACTION COMPLAINT

against people with disabilities and, through their actions described herein, Defendants have directly denied to Plaintiff Premo and the Colorado Subclass Members, because of their disabilities, the full and equal enjoyment of their goods, services, privileges, advantages and accommodations.

247.     Plaintiff Premo and the Colorado Subclass Members have been damaged and will continue to be damaged by this discrimination as more fully set forth herein.

## COUNT VII
## TEXAS DISCRIMINATION
(On Behalf of Plaintiff Ruby Smith and Texas Subclass
Members for violation of the Texas Human Resource Code against Dunkin)

248.     Plaintiff Ruby Smith realleges and incorporates by reference the allegations in paragraphs 1-167 of this First Amended Complaint as if fully set forth herein.

249.     The Texas code states "[p]ersons with disabilities have the same rights as the able-bodied to the full use and enjoyment of any public facility in the state." Tex. Hum. Res. Code Ann. § 121.003(a).

250.     "'Public facilities' includes … any other place of public accommodation, …[or] convenience, … to which the general public or any classification of persons from the general public is regularly, normally, or customarily invited." *Id.* § 121.002(5).

251.     Dunkin stores are public facilities as defined in § 121.002(5). Defendants are prohibited from discriminating against Plaintiff and other members of the putative class on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, and advantages offered by Defendants.

252.     Plaintiff Smith and the Texas Subclass Members who were charged the Surcharge for Non-Dairy Alternatives seek minimum statutory damages under § 121.004(b).

253.     Defendants' Surcharge for Non-Dairy Alternatives discriminates against people with disabilities and, through their actions described herein, Defendants have directly denied to Plaintiff Smith and the Texas Subclass Members, because of their disabilities, the full and equal enjoyment of their goods, services, privileges, advantages and accommodations.

254.     Plaintiff Smith and the Texas Subclass Members have been damaged and will continue to be damaged by this discrimination as more fully set forth herein.

FIRST AMENDED CLASS ACTION COMPLAINT

## COUNT VIII
### UNJUST ENRICHMENT/RESTITUTION

255.   The allegations contained in paragraphs 1-167 of this First Amended Complaint are incorporated by reference as if fully set out herein.

256.   Plaintiffs Chelsea Garland, Geaneen Cojom, Tonya Hughes, Natasha Hernandez, and the members of the California Subclass, Burton Subclass, Hollywood Subclass, Oakland Subclass, Madison Subclass and Golden Gate Subclass assert this count under California law.

257.   Plaintiffs Albert Fitch, Pauleen Mara and the New York Subclass assert this count under New York law.

258.   Plaintiff Arsenio Pelayo and the Hawaii Subclass assert this count under Hawaii law.

259.   Plaintiff Lora Premo and the Colorado Subclass assert this count under Colorado law.

260.   Plaintiff Urcelina Medeiros and the Massachusetts Subclass assert this count under Massachusetts law.

261.   Plaintiff Ruby Smith and the Texas Subclass assert this count under Texas law.

262.   Under the laws of California, Texas, Massachusetts, New York, Colorado, and Hawaii, Defendants' actions in surcharging Plaintiff and putative class members for purchasing dairy-free menu items is unlawful because it constitutes arbitrary and unequal treatment of disabled patrons in violation of the ADA and the Unruh Act. Defendants took additional monies from Plaintiffs and members of the putative class for dairy-free menu items that were substantially identical to non-dairy free menu items except for the presence of dairy based solely on the fact that Plaintiff and the putative class cannot consume drinks with dairy and had no choice but to pay a surcharge for dairy-free foods.

263.   Plaintiffs conferred a benefit on Defendants by allowing them to collect a surcharge in exchange for providing Plaintiffs with non-dairy alternatives such as lactose-free milk.

264.   The Defendants enriched themselves at the expense of Plaintiffs and each of the putative class members by its illegal levying of the Surcharge for Non-Dairy Alternatives.

265.   Plaintiffs and putative class members continue to suffer injuries as a result of the Defendants' illegal and discriminatory behavior. If the Defendants do not compensate the Plaintiffs,

Defendants would be unjustly enriched as a result of its unlawful acts or practices.

266. It is an equitable principle that no one should be allowed to profit from his own wrongdoing, therefore it would be inequitable for the Defendants to retain said benefit and reap unjust enrichment.

267. Since Defendants unjustly enriched themselves at the expense of Plaintiffs and putative class members, Plaintiffs request the disgorgement of these illegally obtained monies.

268. Due to Defendants' conduct, Plaintiffs and the putative class members are entitled to damages according to proof, but in no event less than $5,000,000.00.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, CHELSEA GARLAND, TONYA HUGHES, NATASHA HERNANDEZ, GEANEEN COJUM, ARSENIO PELAYO, ALBERT FITCH, PAULEEN MARA, LORA PREMO, UNCELINA MEDEIROS and RUBY SMITH, respectfully request that this Court enter judgment in their favor and in favor of those similarly situated, as follows:

1. Certifying and maintaining this action as a class action, with the named Plaintiffs as designated class representative and with their counsel appointed as class counsel;

2. A declaration that Defendants are in violation of each of the Counts set forth above;

3. Award Plaintiffs and those similarly situated statutory, compensatory, and treble damages;

4. Award Plaintiffs and those similarly situated liquidated damages;

5. Order the disgorgement of illegally obtained monies;

6. Award each named Plaintiff a service award;

7. Award attorneys' fees and costs; and

8. Grant such further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a jury trial of the claims asserted in this First Amended Class Action Complaint.

Dated: December 11, 2024

Respectfully submitted,

/s/ Bogdan Enica

Bogdan Enica (*Pro Hac Vice*)
KEITH GIBSON LAW, P.C.
1200 N Federal Hwy. Ste.300
Boca Raton FL 33432
Telephone: (305) 306-4989
Email: bogdan@keithgibsonlaw.com

Keith L. Gibson (*Pro Hac Vice*)
KEITH GIBSON LAW, P.C.
586 Duane Street, Suite 102
Glen Ellyn, IL 60137
Telephone: (630) 677-6745
Email: keith@keithgibsonlaw.com

Trenton R. Kashima (SBN No. 291405)
MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC
402 West Broadway, Suite 1760
San Diego, CA 92101
Telephone: (619) 810-7047
Email: tkashima@milberg.com

*Counsel for Plaintiffs and the Putative Class*

# UNITED STATES DISTRICT COURT

## FOR THE NOTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHELSEA GARLAND, *et al*., individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>  vs.<br><br>DUNKIN DONUTS FRANCHISING, LLC, 6201 HOLLYWOOD DONUTS LLC, BURTON RESTAURANTS, LLC, RW OAKLAND LLC, MADISON FOOD MANAGEMENT, LLC, GOLDEN GATE RESTAURANT GROUP LLC,<br><br>        Defendants. | Case No. 23-cv-06621-SI<br><br>**PROOF OF SERVICE** |

I, the undersigned, declare that I am over the age of eighteen (18) years and not a party to the within action. I am employed in the County of Palm Beach, State of Florida. My business address is 1200 N Federal Hwy., Suite 300, Boca Raton, FL 33432.

I served the following document(s) on December 11, 2024:

**FIRST AMENDED CLASS ACTION COMPLAINT**

On the person(s) listed below:

> Meghan McBerry, Esq.
> Brett Eric Coburn, Esq.
> David Baird Carpenter, Esq.
> Alston & Bird LLP
> 560 Mission Street, Suite 2100
> San Francisco, CA 94105
> Meghan.McBerry@alston.com
> Brett.Coburn@alston.com
> David.Carpenter@alston.com

> Counsel for Defendant Dunkin Donuts LLC.

By the following means:

☐ by placing the documents(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at San Diego, California, addressed as set forth above.

☐ by personally delivering the document(s) listed above to the person(s) at the address(es) above.

☐ by placing the document(s) listed above, in a sealed envelope or package provided by an overnight delivery carrier with postage paid on account and deposited for collection with the overnight carrier at San Diego, California, addressed as set forth above.

☐ by transmitting the document(s) listed above, electronically, via the e-mail addresses set forth above.

☒ electronically by using the Court's ECF/CM System.

I declare under penalty of perjury under the laws of the State of California, that the foregoing is true and correct and that I am admitted *pro hac vice* to this Court in this case.

Dated: December 11, 2024

/s/ Bogdan Enica

Bogdan Enica, Esq.
(admitted pro hac vice)
FL Bar No. 0101934
Keith Gibson Law P.C.
1200 N federal Hwy. Ste.300
Boca Raton FL 33432
bogdan@keithgibsonlaw.com
Ph: (305) 306-4989

FIRST AMENDED CLASS ACTION COMPLAINT